**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Marimar Martinez,

Plaintiff,

v.

The United States of America

Defendant.

**Complaint at Law**

Now Comes the Plaintiff, Marimar Martinez, by and through her attorneys, Gallagher & Kosner, and Cheronis & Parente, and complaining of Defendant, The United States of America alleges as follows:

**Introduction**

1. During the 2024 presidential campaign, Donald Trump ("Trump") repeatedly told the American public that his proposed immigration crackdown was necessary to protect them from dangerous undocumented criminals.

2. On September 8, 2025, the Department of Homeland Security ("DHS") announced "Operation Midway Blitz" which was a highly publicized federal initiative to conduct wide-spread arrests and deportations of undocumented Chicago residents. In its official announcement, DHS stated: "This operation will target the worst of the worst criminal illegal aliens in Chicago."

3. Less than one month later, on October 4, 2025, United States Border Patrol Agent Charles Exum ("Agent Exum") shot Plaintiff Marimar Martinez ("Marimar") five times with his government issued Glock 47 handgun. Marimar was a 30-year-old United States citizen, born and raised in Chicago. She worked as a teaching aide at a Montessori school and had no criminal history.

4. Marimar was among the American citizens the Trump Administration claimed its operation would protect. The day before the shooting, she had been singing, dancing, and preparing fall activities with the children at her school. The next day, she suffered multiple gunshot wounds at the hands of a federal agent, was taken into federal custody, and publicly branded a domestic terrorist by her own government.

5. Trump and his administration knowingly used these public-safety assurances to conceal a broader, racially discriminatory agenda: targeting brown people for arrest, detention, and attempted deportation with little regard for their citizenship, lawful immigration status, or lack of criminal history. The promise to target dangerous undocumented criminals supplied a pretext for treating skin color and perceived foreignness as grounds for suspicion and coercion, as the conduct alleged below demonstrates.

6. On April 30, 2026, the Illinois Accountability Commission ("Commission") issued a comprehensive and damning 196-page report at the conclusion of the Commission's thorough 6-month investigation into the Trump Administration's Operation Midway Blitz. A primary focus of the Commission's investigation was the United States Customs and Border Protection ("CBP") Agent Exum's shooting of Marimar.

7. The Commission's Chair, Retired Federal Judge Ruben Castilo, stated "[I]n my 25 years as a federal judge, I've never seen the type of brutality shown by the agents involved in Midway Blitz." In specifically analyzing the shooting of Marimar by Agent Exum, the Commission determined "Federal agents produced materially inaccurate official reports" and that "[e]vidence was deliberately tampered with and destroyed" before concluding that Agent Exum "shot an unarmed civilian without apparent justification."

## Jurisdiction and Venue

8. This Court has jurisdiction under 28 U.S.C. §§ 1346 and 2674.

9. The jurisdiction of this Court, as to Plaintiff's claims against Defendant the United States of America is based upon 28 U.S.C. §1346(b). Marimar filed an administrative claim for damages against the United States on February 12, 2026, with the Department of Homeland Security, United States Immigration and Customs Enforcement, and United States Customs and Border Protection. Defendant the United States of America failed to respond within six months of receiving said claim.

10. Venue is proper in the Northern District of Illinois under 28 U.S.C. §§ 1391 and 1402(b) because the events giving rise to this action occurred in Chicago, Illinois.

## Parties

11. Plaintiff Marimar Martinez is an adult resident of Cook County, Illinois.

12. Defendant the United States of America is a sovereign governmental entity. It performs activities by and through its agencies, United States Department of Homeland Security, United States Customs and Border Protection, and United States Immigration and Customs Enforcement. It is liable under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2674, for the negligent or wrongful acts and omissions of its employees acting within the scope of their employment.

13. Agent Exum is or at least was when the events giving rise to this action occurred, a United States Border Patrol agent employed by CBP, a component of the United States Department of Homeland Security. At all relevant times, Agent Exum was an investigative or law enforcement officer of the United States empowered by law to execute searches, to seize evidence, and to make arrests for violations of federal law, see 28 U.S.C. § 2680(h), and he acted under color of federal law.

## Facts Common To All Counts

***Agent Exum unjustifiably shoots Marimar five times, on October 4, 2025.***

14. For her part, Marimar had observed CBP and ICE agents straying from their stated mission of targeting the "worst of the worst" and instead targeting her friends and neighbors with brown skin, no criminal history and who were working honest jobs in the community. Marimar's personal observations were similarly reflected in the national news and social media which contained reports and videos of Operation Midway Blitz operatives clad in military fatigues with their faces covered, violently targeting and arresting United States citizens and non-citizens alike with no probable cause or reasonable suspicion for detainment or arrest. At least one of these attacks resulted in the killing of a Chicago resident in broad daylight just three weeks prior to Marimar's shooting.

15. On the morning of October 4, 2025, in Chicago, Illinois, Marimar was driving to her local church to donate clothes for those in need. While driving to the church, Marimar observed a sports-utility vehicle ("SUV") occupied by three men who appeared to be surveilling her neighborhood. The men wore green military style fatigues, and the covert SUV had an out of state license plate in back, no front plate, and had a prominent rideshare logo on front windshield.

16. Based on that information, Marimar correctly determined that the SUV's occupants were Federal agents participating in Operation Midway Blitz. The SUV was being driven by Agent Exum and CBP Agents Lorenzo Cordero ("Agent Cordero") and Adam Perkins ("Agent Perkins") occupied the back seat.

17. Marimar began following the SUV through her neighborhood, honking her horn and calling out from her window to alert residents to the CBP Agents' presence. Like Paul Revere sounding the alarm to warn against Redcoat invaders, she sought to protect her community by giving her neighbors advance warning of the danger she believed the approaching agents posed to them.

Marimar live streamed her warning to the community utilizing Facebook Live for portions of the encounter.

18. As both vehicles proceeded northbound on Kedzie Avenue, Marimar continued to honk her horn while following the SUV. At that time, Agent Cordero seated in the rear-passenger seat activated his body-worn camera ("BWC"). Moments later, Agent Exum or one of the other agents was recorded inside their vehicle stating "do something bitch!", referring to Marimar, while pointing their military-style assault rifle at her vehicle.

19. The CBP Agents were then recorded saying "[i]t's time to get aggressive and get the fuck out ..." before stating "we're going to make contact and we're boxed in." In truth, the agents were not boxed in and were not facing imminent contact with another vehicle. Nonetheless, approximately four seconds afterwards, Agent Exum abruptly and deliberately swerved the SUV into Marimar's lane before violently striking her vehicle.



***Agent Exum turns steering wheel into Marimar's vehicle upon impact***

20. After the collision, Marimar immediately stopped her vehicle. At no time during this encounter did Marimar take any action that would make the agents in the SUV reasonably fear for their safety or believe that Marimar presented a threat to them or to the public.



***Agent Exum with gun before exiting SUV***

21. Gun in-hand, and upon information and belief, Agent Exum yelled "all right, it's on now fuckers!" before he exited the SUV. Within two seconds of exiting the SUV and without giving any verbal commands or warnings, Agent Exum fired his weapon five times into Marimar's vehicle, striking her seven times. The bullets hit both of Marimar's legs, her right thigh, her right forearm, and the right side of her chest.

22. In justifiable fear for her life, Marimar drove forward and to her left, up onto the west-side curb of Kedzie Avenue and away from Agent Exum. At no time did she pose a threat of harm to Agent Exum or anyone else on the street.

23. The entry points and trajectory of Agent Exum's bullets provide objective evidence that Marimar *was not* driving toward Agent Exum when he fired his weapon, as he falsely claimed to

the FBI. The evidence establishes that Agent Exum was standing beside Marimar's vehicle when he fired the first three shots which entered the passenger side of the front window before striking Marimar




***Agent Exum's first three shots***

24. As Marimar drove away from him, Agent Exum fired his fourth shot through her front passenger-side window as she was nearly past him and his fifth and final shot through her rear passenger-side window when she was past him. The entry points and trajectory of these bullets confirm that Marimar's vehicle had already passed Agent Exum and was moving away from him when he fired these shots. In fact, the objective evidence shows Agent Exum was walking *towards* Marimar's vehicle as he continued firing his gun.





***Bullet entry points visible within Marimar's vehicle***



***Shattered rear passenger window and plastic bag of donated clothes***

25. Marimar was bleeding profusely from the multiple bullet wounds and began becoming lightheaded before she pulled over into a parking lot. Unable to control her fingers because of her injuries, Marimar utilized her cell phone’s voice calling feature to dial 911 and reported that she had been shot by “ICE” Agents and requested an ambulance. She passed out from the trauma a short time later.

26. Marimar was taken by ambulance to Mt. Sinai Hospital in Chicago where she received emergency medical care for her gunshot wounds. Shortly after being admitted to the hospital, two men that identified themselves as Federal Bureau of Investigations (“FBI”) agents questioned Marimar about the circumstances of Agent Exum shooting her.

27. In less than 3 hours after arriving for treatment of multiple gunshot wounds, Marimar was arrested by the FBI and discharged from Mt. Sinai Hospital. At the time of discharge, Marimar was wheelchair bound and her bullet wounds were leaking blood through her bandages.

28. Marimar was brought to an FBI Office building in Chicago where her bandages continued to leak blood causing a pool of blood to form at her feet. Marimar overheard agents discussing the likelihood that the federal detention center would refuse to accept her in her current medically unstable condition.

29. Throughout this time Marimar pleaded with agents to bring her to a different hospital for adequate medical care. Eventually the agents relented and took her to John H. Stroger Hospital, for further treatment.

30. The next day – and less than twenty-fours after she had been shot five times - federal agents once again effectuated Marimar's release from the hospital and transported her to the Metropolitan Correctional Center in Chicago, Illinois. Based on multiple false statements by Agent Exum and his fellow CBP Agents, federal prosecutors charged Marimar by criminal complaint with forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with a federal officer.

***CBP Agents' post-shooting lies and attempt to destroy evidence***

31. On October 6, 2025, Marimar was brought to federal court in poor physical condition. Federal prosecutors sought the continued detention of Marimar claiming the Montessori school teacher's assistant with no criminal history was a "danger to the community." The Magistrate Judge rejected their claims and ordered Marimar's immediate release. Marimar was released that evening and went to a local hospital for further treatment of her wounds.

32. During discovery in the criminal matter, Marimar's attorneys received footage from CBP Agent Cordero's BWC, text messages sent by Agent Exum regarding the shooting, and the CBP Agents' recorded statements to FBI investigators and Assistant United States Attorneys ("AUSAs").

33. Agent Exum, who had been issued a BWC device and had it inside the vehicle, did not have his BWC activated before, during, or after the shooting in direct violation of the CBP Directive No.: 4320-030B which requires the following: 1) CBP "will be used to record official law enforcement encounters"; 2) "authorized personnel should record enforcement encounters at the start of the event or as soon as safely possible thereafter"; 3) and any recording requirement exemptions *do not* apply when an agent is "engaged in a use of force."

34. On October 4, 2025, Agent Cordero and Agent Perkins were interviewed by FBI agents and the federal prosecutors. Both Agents falsely claimed that Marimar's vehicle initiated contact by striking the SUV. Agent Cordero also falsely claimed the agents decided to exit the SUV because its path forward was blocked, while Agent Perkins falsely claimed that Marimar "drove up trying to hit Agent Exum." All these falsehoods are contradicted by objective video evidence and statements of independent third party witnesses.

At approximately 10:00 a.m. UF2 in the silver Nissan struck the QRF team silver Tahoe on the driver side. At approximately the time of the impact Cordero activated his body worn camera. The impact turned the QRF Tahoe to the left. UM in the black GMC then struck the rear passenger bumper of the

FBIMAIN_001-0(

89B-CG-4143502 Serial 32

2a (Rev. 5-8-10)

89B-CG-4143502

nuation of FD-302 of (U) Interview of Lorenzo Cordero , On 10/04/2025 , Page 3 of 4

QRF Tahoe. The QRF Tahoe started to spin to the left but the driver, Agent Exum, corrected course and stopped the vehicle. The QRF Tahoe could not go forward and the QRF team decided to exit the car so they could leave the area or make arrests. Cordero exited the QRF Tahoe, with Agent Exum and Agent Perkins. Cordero pointed his rifle at the black GMC and saw UM in the black GMC pointing his fingers like a gun, taking pictures with his phone, and flashing what could have been gang signs. No one else appeared to be in the vehicle. Cordero then heard tires burning out and then heard gunfire.

****

Agent PERKINS told Agent EXUM that it looked like the cars were trying to box them in. The Nissan side swiped the CBP vehicle, and the black GMC with a Mexican flag on the hood hit them on the right rear quadrant. The QRF vehicle spun out a little bit and Agent EXUM got it back under control. The QRF vehicle stopped, Agent EXUM put in park and everyone got out of the vehicle. Agent PERKINS focused on what was happening on the side and back. The Nissan was approximately 10 feet from Agent PERKINS. Agent EXUM was behind and to the right of Agent PERKINS. The driver of the Nissan drove up trying to hit Agent EXUM, and Agent PERKINS heard EXUM say something along the lines of "stop" and heard shots. Agent PERKINS had his rifle up and

35. Agent Cordero's body-camera footage confirms that Agent Exum sharply turned the SUV's steering wheel to the left immediately before the SUV struck Marimar's vehicle. No evidence supports any claim that Marimar's vehicle initiated contact. Surveillance footage from a nearby gas station and tire repair shop further establishes that the SUV had an unobstructed path forward, with no vehicles or objects blocking its way.



***No vehicles or objects blocking SUV's path forward when it came to a stop***




***No vehicles or objects blocking SUV's path forward when it came to a stop***

36. Agent Cordero also provided the following diagram falsely claiming that there were three vehicles that blocked the SUV’s path forward. As the above video screenshots establish, there were no such vehicles, and Agent Cordero’s claim to the contrary was a lie.




***Three non-existent vehicles outlined in red and the SUV outlined in yellow***

37. On October 4, 2025, Agent Exum was interviewed by FBI agents and the federal prosecutors. Agent Exum falsely claimed that Marimar drove her vehicle directly at him and he fired 5 times through the windshield of her vehicle. These lies were rebutted by the objective evidence showing 3 shots went through the passenger side of the front windshield and Agent Exum's final two shots were fired after Marimar was past him through the side and rear windows of her vehicle.



FD-302 (Rev. 5-8-10)

-1 of 2-

FEDERAL BUREAU OF INVESTIGATION

OFFICIAL RECORD

Date of entry 10/18/2025

On October 04, 2025, Supervisory Border Patrol (BP) Agent Charlie Exum (Exum), cellphone number [redacted] email address [redacted]cbp.dhs.gov, was interviewed in the vicinity of 3939 South Kedzie Avenue, Chicago Illinois 60632. After being advised of the identity of the interviewing Agents and the nature of the interview, Exum provided the following information:

On October 04, 2025, at approximately 10:30 a.m., BP Agent Exum, BP Agent BPA 2, and BP Agent BPA 3) were in a silver Chevrolet Tahoe bearing Kentucky license plate [redacted]. Exum was the driver. He had his armor kit and carbine in the front passenger area of the vehicle, and he was wearing a "cover shirt". BPA 2 and BPA 3 were rear passengers.

Exum, BPA 2 and BPA 3 were in a BP convoy driving after a recent operation. One of the vehicles in BP convoy had a subject that was in custody. While driving, more than four non-law enforcement (LE) vehicles were following the BP convoy. As Exum and the rest of the BP convoy continued to drive, Exum made a turn away from the BP convoy in an attempt to draw the non-LE vehicles away from the rest of the BP convoy. Exum saw the non-LE vehicles continued to follow him.

While driving northbound on south Kedzie avenue, a black pick-up truck got in front of Exum, a black GMC Envoy bearing IL plate [redacted] approached Exum on the passenger side of his vehicle, and a silver SUV approached Exum on the driver side of his vehicle. The vehicles on the sides of Exum began

SUV drove towards Exum. Exum then drew his handgun and discharged it five

After contact was made, Exum veered his vehicle to the left in an attempt to create space. After creating space, Exum put his vehicle in park. He told BPA 2 and BPA 3 to exit the vehicle so they would not get trapped. He then exited the vehicle himself. After Exum exited his vehicle, the silver SUV drove towards Exum. Exum then drew his handgun and discharged it five

Investigation on 10/04/2025 at Chicago, Illinois, United States (In Person)

File # [redacted] Date drafted 10/04/2025

by [redacted]

FD-302a (Rev. 5-8-10)

[redacted]

[redacted] Interview of Border Patrol Agent

Continuation of FD-302 of Charlie Exum, On 10/04/2025, Page 2 of 2

times through the windshield at the female driving the silver SUV. Exum ceased firing his handgun once he was no longer in the path of the vehicle. The female had her phone up, as if she was recording.

The female driver of the silver SUV continued to drive away. Exum did not observe where the silver SUV went. Exum's silver Tahoe did not have damage

times through the windshield at the female driving the silver SUV. Exum ceased firing his handgun once he was no longer in the path of the vehicle. The female had her phone up, as if she was recording.

Exum did not have his body worn camera (BWC) on, as it was on his armor kit.

Agreed Redactions for Public Dissemination

38. A forensic biomechanical reconstruction of the shooting establishes that not only was Agent Exum never in the path of Marimar's vehicle, she also arced her vehicle westward and to the left of Agent Exum, thereby moving even further away from Agent Exum as she attempted to drive past him. This reconstruction revealed that the first three bullets Agent Exum fired at Marimar struck the passenger side of her front windshield as he stood safely to the side of her vehicle; he fired the fourth bullet through her front passenger side window as she drove past him; and he fired the fifth bullet through her rear passenger side window, as her vehicle was nearly entirely past him.

39. The objective evidence from this reconstruction also establishes that far from Marimar presenting a risk of harm to Agent Exum; Agent Exum was walking towards Marimar's vehicle while he was firing at her.

40. On October 4, 2025, the DHS issued a public statement hours after one of their agents shot Marimar without legal justification claiming that "they were attacked and *rammed* by the vehicles and boxed in by 10 cars." (emphasis added) *See* September 29, 2026

https://www.dhs.gov/news/2025/10/04/vehicles-again-used-weapon-attack-against-dhs-law-enforcement-officers-forced-fire (last visited September 29, 2026). The DHS's claim that the SUV driven by Agent Exum was "boxed in by 10 cars" is patently false based on the above video footage.

41. At a pretrial hearing regarding Agent Exum's destruction of evidence, while being cross-examined by counsel for Marimar, Agent Exum admitted that there "was no ramming" of his SUV by Marimar or anyone else.

42. On October 6, 2025, Magistrate Judge Heather McShain issued an order expressly warning the federal government that they were obligated to preserve and produce "exculpatory and impeaching evidence" which would include Agent Exum's SUV. Judge McShain confirmed their failure to preserve and produce this evidence "may result in sanctions … including … contempt" of court.

43. On October 8, 2025, Agent Exum violated Judge McShain's order and personally drove the subject SUV from the Chicago FBI Evidence Garage to his assigned CBP station in Calais, Maine.

44. Agent Exum failed to preserve the SUV and ordered it to be "repaired" by the Calais station's mechanic. Defendant further ordered the station's mechanic to materially alter and destroy evidence by "buff[ing] out" the paint transfer marks from his collision with Marimar's vehicle. Finally, Agent Exum materially violated Judge McShain's order by altering or destroying "exculpatory and impeaching evidence."

***Agent Exum boasted of shooting Marimar, and the federal government rewarded him with spreading malicious lies about her.***

45. Only hours after shooting Marimar, Agent Exum sent text messages to fellow CBP agents on a thread titled "Posse Chat." Agent Exum's boasts about shooting a Latina American citizen as

she drove away in a group called "Posse Chat" evokes America's shameful history of armed posses hunting and lynching racial minorities, often with the participation or protection of law enforcement.

46. Agent Exum's text message stated in part "I fired 5 rounds and she had 7 holes. Put that in your book boys." To which an unknown federal agent responded, "Exum is it true that your last words on your body cam was 'doing something bitch?'" Exum replied with "I'm not sure" before the two agents provided "laughing out loud" emojis.




47. In a separate text message exchange, Agent Exum forwarded a news article titled "Federal agents taunted Chicago woman to 'do something' before shooting her" with a "Lmao" comment. The recipient responded "oh sh+t will that come back to bite you", to which Agent Exum replied "oh well, it is what it is. Shit happens."




48. Within hours of Agent Exum's shooting Marimar—and before any investigation had begun—Gregory Bovino, then the Commander-At-Large of the United States Border Patrol, emailed Agent Exum to congratulate him and reward his unlawful use of deadly force by extending his eligibility to remain in the Border Patrol beyond retirement age.




49. Agent Exum also received expressions of support from former Border Patrol Chief Mike Banks, former Secretary of Homeland Security Kristi Noem, and, apparently, President Donald Trump or "El Jefe" himself.




50. On October 4, 2025, the DHS released a statement falsely claiming that Marimar was a "domestic terrorist" that was "armed with a semi-automatic weapon and has a history of doxxing federal agents."


U.S. Department of Homeland Security

**UPDATE: DHS Deploys Special Operations After Multiple Violent Attacks on Federal Law Enforcement by Domestic Terrorists in Chicago**

**Release Date:** October 4, 2025

*Three vehicles used as weapons against our brave law enforcement as they work without pay to make America safe again*

WASHINGTON – This morning, Border Patrol law enforcement officers were ambushed by domestic terrorists that rammed federal agents with their vehicles. The woman, Marimar Martinez, driving one of the vehicles, was armed with a semi-automatic weapon and has a history of doxxing federal agents. She took defensive fire from CBP agents and has been discharged from the hospital and is currently in the custody of the FBI. The driver of another vehicle, Anthony Ian Santos Ruiz, involved in the ramming has been apprehended by law enforcement.

WASHINGTON – This morning, Border Patrol law enforcement officers were ambushed by domestic terrorists that rammed federal agents with their vehicles. The woman, Marimar Martinez, driving one of the vehicles, was armed with a semi-automatic weapon and has a history of doxxing federal agents. She took defensive fire from CBP agents and has been discharged from the hospital and is currently in the custody of the FBI. The driver of

The scene became increasingly violent as more domestic terrorists gathered and began throwing smoke, gas, rocks, and bottles at DHS law enforcement. Another domestic terrorist was arrested for assaulting CBP at the scene. Following JB Prtizker's refusal to allow local police to help secure the scene, Secretary Noem has deployed special operations teams to restore law and order.

*10/4/2025 DHS Press R*

51. On October 4, 2025, DHS Assistant Secretary of Homeland Security for Public Affairs Tricia McLaughlin ("McLaughlin") who served as the DHS spokesperson, repeated the malicious

lie that Marimar "rammed" Agent Exum's SUV and was "armed with a semi-automatic weapon". McLaughlin took the lies and slander one step further by claiming the SUV was "boxed in by 10 cars" and that Marimar had a history of "doxing" federal agents.

52. On October 5, 2025, FBI Director Kash Patel ("Patel") issued a social media post falsely claiming that Marimar was "charged for assaulting federal officers with a deadly or dangerous weapon." Patel also reposted a video that allegedly showed Marimar "aka La Maggie" ramming a DHS vehicle while a "DHS agent is on the passenger side firing shots. Democrats are insane." However, there was one glaring inaccuracy with Patel's post: the video captured an entirely different event that did not involve Marimar or Agent Exum.

Tricia McLaughlin
@TriciaOhio

This morning, during routine patrolling in Broadview, in the same area of Chicago that law enforcement were assaulted yesterday, our brave law enforcement officers were rammed by vehicles and boxed in by 10 cars.

Agents were unable to move their vehicles and exited the car. One of the drivers who rammed the law enforcement vehicle was armed with a semi-automatic weapon. Law enforcement was forced to deploy their weapons and fire defensive shots at an armed US citizen who drove herself to the hospital to get care for wounds.

The armed woman was named in a @CBP intelligence bulletin last week for doxing agents and posting online 'Hey to all my gang let's fuck those mother fuckers up, don't let them take anyone.'

Thankfully, no law enforcement officers were seriously injured in this attack.

Pritzker's Chicago Police Department is leaving the shooting scene and refuses to assist us in securing the area. There is a growing crowd and we are deploying special operations to control the scene.

This is an evolving situation and we will give more information as soon as it becomes available.

12:19 PM · Oct 4, 2025 · **5.2M** Views

4.1K 11K 34K 2.3K

Read 4.1K replies

Post

FBI Director Kash Patel
@FBIDirectorKash

The @FBI just arrested two individuals who were allegedly driving these vehicles and attacking our federal law enforcement officers.

They have been charged for assaulting federal officers with a deadly or dangerous weapon.

Attack our law enforcement, and this FBI will find you and bring you to justice. @FBIChicago

Kim "Katie" USA @KimKatieUSA · Oct 5, 2025
BREAKING: This is the video where Marimar Martinez, aka La Maggie, rammed a white DHS vehicle who had their emergency lights on. Another DHS black SUV then attempts to ram Marimar's SUV from behind. One DHS agent is on the passenger side firing shots. Democrats are insane.



1:27

Readers added context
The Department of Homeland Security confirmed this video is not from the Oct. 4, 2025 incident involving federal agents and "La Maggie" in Chicago.
x.com/TriciaOhio/sta...

7:55 PM · Oct 5, 2025 · **1.2M** Views

1.6K 3.9K 21K 447

Read 1.6K replies

53. The DHS initial and *continued* claim that Marimar is a "domestic terrorist" is baseless, malicious, and defamatory on its face. As the DHS and the federal government are well aware, Marimar is a Montessori school teacher's assistant with no criminal history.

54. The DHS was also aware that Marimar was not "armed with a semi-automatic weapon" or "charged for assaulting federal officers with a deadly or dangerous weapon." Instead, Marimar had a valid Firearm Owner's Identification ("FOID") card and Illinois Concealed Carry License ("CCL") which allowed her lawfully to possess a weapon in public. More importantly, the DHS and FBI were aware within minutes of the shooting that Marimar's small handgun was holstered and buried in her large purse at the time Agent Exum attempted to shoot her.[1]





55. In fact, Judge Georgia N. Alexakis – who presided over Marimar's criminal matter – chastised the federal government with the following: "Here's what I struggle with. I don't understand why the United States government, after being given many, many opportunities to do so, has expressed zero concern about sullying Marimar's reputation. She's a United States

[1] Marimar's holstered handgun is not even visible while inside her purse.

citizen. She's a resident of this district. And under our legal system, it bears repeating, she is presumed innocent of any offense for which she has not been convicted."

56. Agent Exum's unlawful conduct was not just embraced, celebrated, and rewarded by his supervisors; his unlawful behavior was also celebrated by his colleagues who are Border Patrol agents currently patrolling cities across the United States and who view Agent Exum's shooting of Marimar as heroic work worthy of celebration.




57. Agent Exum's lawless decision to open fire on Marimar as she drove away from him, was in direct contravention to CBP's Use of Force policy, which states that officers "shall not discharge their firearms at the operator of a moving vehicle [] unless deadly force is necessary" and that situations where deadly force is appropriate "would not include a moving vehicle merely fleeing from officers/agents":



7. Authorized Officers/Agents shall not discharge their firearms at the operator of a moving vehicle, vessel, or aircraft unless deadly force is necessary, that is, when the officer/agent has a reasonable belief that the operator poses an imminent danger of serious bodily injury of death to the officer/agent or to another person

a. Such force may include a moving vehicle aimed at officers/agents or other present, but would not include a moving vehicle merely fleeing from officers/agents unless the vehicle or the escape of the subject poses an imminent threat of serious bodily injury or death to the officer/agent or to another person



58. Despite the reckless encouragement and approval of Agent Exum's unlawful shooting of Marimar, the Department of Homeland Security has a documented respect for life policy which was ignored in this matter:



CBP Use of Force Policy January 2021

FOREWORD FROM THE COMMISSIONER

U.S. Customs and Border Protection (CBP) is entrusted with the critical responsibility of protecting our nation's borders. This mandate carries with it the authority to use force up to and including the use of deadly force. The following policy provides guidance and parameters under which force may be used. It also provides the levels of oversight when force is used, and the ongoing training and demonstration of decision-making and skill surrounding the use of force.

A respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties. In all instances, covered in this policy or not, Authorized Officers/Agents shall only use objectively reasonable and necessary force to effectively bring an incident under control, while minimizing the risk of injury for all involved parties.

A respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties. In all instances, covered in this policy or not, Authorized Officers/Agents

This *Policy* establishes the minimum CBP policy standards regarding the use of force. CBP offices may establish additional policy guidance where they deem necessary, in accordance with the minimum standards articulated in this *Policy*.

CBP adheres to the *DHS Policy on the Use of Force* and the *Department of Homeland Security Commitment to Nondiscriminatory Law Enforcement and Screening Activities* policy statement.

Violation of the *CBP Use of Force Policy* may constitute grounds for disciplinary action.

This document sets forth policy and training guidance for CBP employees, while meeting the requirements of the *DHS Policy on the Use of Force*, and does not create or confer any right, privilege, or benefit for any person, party or entity. United States v. Caceres, 440 U.S. 741 (1979).

Mark A. Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

Foreword Page i

59. Marimar brings this lawsuit to vindicate the violation of her civil rights as well as the severe physical and emotional injuries inflicted on her by the United States of America.

**Count I**
**Negligence - Federal Tort Claims Act**
**The United States of America**

1-59. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 59 as if fully stated herein.

60. At all times while acting within the course and scope of his employment with the United States of America, Agent Exum had a duty to not cause personal injury through his own wrongful acts or omissions. Agent Exum further had a duty to act with due care in accordance with applicable federal policies and procedures including those governing the use of force.

61. At all times Agent Exum was an officer of the United States who was empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

62. Agent Exum breached said duties through one or more of the following negligent, willful, and/or wanton acts:

a. Shooting Ms. Martinez five times while she was unarmed and presented no risk of harm to anyone;
b. Failing to comply with mandatory use of force policies; and
c. Swerving his vehicle into the path that Ms. Martinez's vehicle was traveling in, thereby leaving her no time to react and causing a collision between the vehicles;

63. As a direct and proximate result of the aforesaid actions of the Agent Exum, Ms. Martinez has suffered severe injuries of a pecuniary and personal nature.

64. Agent Exum undertook such acts while acting within the scope of his office or employment with the United States of America.

65. At no time did Agent Exum have the discretion to engage in the aforementioned acts or omissions and he did so in contravention to mandatory use of force policies.

66. A private person would be liable to Ms. Martinez under like circumstances, under the laws of Illinois. Because Agent Exum was acting within the scope of his federal employment, the United States is liable for his negligent acts under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2674.

**Count II**
**Battery - Federal Tort Claims Act**
**The United States of America**

1-59. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 59 as if fully stated herein.

60. At all times Agent Exum was an officer of the United States who was empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

61. Agent Exum intentionally and knowingly made harmful and offensive contact with Ms. Martinez's vehicle and with her direct person.

62. Agent Exum made such harmful and offensive contacts without authorization or justification to do so.

63. Agent Exum made such harmful and offensive contacts while acting within the scope of his office or employment with the United States of America.

64. At no time did Agent Exum have the discretion to engage in the aforementioned acts and he did so in contravention to mandatory use of force policies.

65. As a direct and proximate result of the actions of Agent Exum, Ms. Martinez has suffered severe injuries of a pecuniary and personal nature.

66. A private person would be liable to Ms. Martinez under like circumstances for battery under the laws of Illinois. Because Agent Exum was an investigative or law enforcement officer

acting within the scope of his federal employment, the United States is liable for his battery under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674, and 2680(h).

**Count III**
**Assault - Federal Tort Claims Act**
**The United States of America**

1-59. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 59 as if as if fully stated herein.

60. At all times Agent Exum was an officer of the United States who was empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

61. Agent Exum intentionally and knowingly threated Ms. Martinez with imminent bodily injury when he swerved his SUV at Ms. Martinez and when he pointed and fired his weapon at Ms. Martinez.

62. Agent Exum's actions caused Ms. Martinez to suffer reasonable apprehension of an imminent peril.

63. Agent Exum made such harmful and offensive contacts while acting within the scope of his office or employment with the United States of America.

64. At no time did Agent Exum have the discretion to engage in the aforementioned acts and he did so in contravention to mandatory use of force policies.

65. As a direct and proximate result of the actions of Agent Exum, Ms. Martinez has suffered severe injuries of a pecuniary and personal nature.

66. A private person would be liable to Ms. Martinez under like circumstances for assault under the laws of Illinois. Because Agent Exum was an investigative or law enforcement officer acting within the scope of his federal employment, the United States is liable for his assault under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674, and 2680(h).

**Count IV**
**Intentional Infliction of Emotional Distress - Federal Tort Claims Act**
**The United States of America**

1-59. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 59 as if as if fully stated herein.

60. Agent Exum engaged in extreme and outrageous conduct when he fired his weapon at Ms. Martinez five times without any legal justification and in an outrageous abuse of his power as a federal agent.

61. Agent Exum fired his weapon at Ms. Martinez despite knowing that his decision to open fire was certain or nearly certain to cause her severe emotional distress.

62. As a direct and proximate result of Agent Exum's malicious and lawless violence, Ms. Martinez suffered severe physical and emotional injuries.

63. At all times Agent Exum was an officer of the United States who was empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law and his extreme and outrageous actions arose out of that authority.

64. At no time did Agent Exum have the discretion to engage in the aforementioned acts and he did so in contravention to mandatory use of force policies.

65. Agent Exum engaged in this outrageous and intolerable behavior while acting within the scope of his office or employment with the United States of America.

66. All private persons would be liable to Ms. Martinez under like circumstances for the intentional infliction of emotional distress under the laws of Illinois. Because Agent Exum was an investigative or law enforcement officer acting within the scope of his federal employment, the United States is liable for his intentional infliction of emotional distress under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674, and 2680(h).

**Count V**
**Malicious Prosecution - Federal Tort Claims Act**
**The United States of America**

1-59. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 59 as if as if fully stated herein.

60. A baseless and malicious prosecution without probable cause (i.e. without there existing a state of facts that would lead a person of ordinary caution and produce to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged) for forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with a federal officer, was instituted against Ms. Martinez, and caused by Agents Exum, Cordero, and/or Perkins out of an improper motive to obfuscate the fact that Ms. Martinez was the victim of indefensible government violence.

61. The prosecution against Ms. Martinez was caused by and founded upon false evidence provided to the FBI by Agents Exum, Cordero, and/or Perkins. These agents produced false evidence to indicate that Ms. Martinez attempted to harm them with her vehicle despite knowing that Ms. Martinez was innocent of any such acts and never presented a risk of harm to any agents or the public.

62. The prosecution against Ms. Martinez was caused by and founded upon the alteration and/or suppression of exculpatory evidence by Agents Exum, Cordero, and/or Perkins through *inter alia*, failing to preserve the SUV so it could be analyzed, failing to operate their BWC during the initiation of lethal force against Ms. Martinez as required by CBP policy, and failing to document that Ms. Martinez never presented a risk of harm to the agents or to the public.

63. At all times when making the aforementioned false evidence and altering and/or suppressing exculpatory evidence, these agents were officers of the United States who were

empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law and they acted within the course and scope of their agency with the United States of America.

64. As a direct and proximate result of this malicious prosecution, Ms. Martinez has suffered severe injuries of a pecuniary and personal nature

65. At no time did the federal agents have discretion to effectuate Ms. Martinez's malicious prosecution and they did so in contravention to federal law and policy which prohibit the fabrication and provision of false evidence as well as the disregarding of a court's lawful order.

66. All private persons would be liable to Ms. Martinez under like circumstances for malicious prosecution under the laws of Illinois. Because the federal agents causing Ms. Martinez's malicious prosecution were investigative or law enforcement officers acting within the scope of their federal employment, the United States is liable for their malicious prosecution under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674, and 2680(h).

**Count VI**
**False Arrest - Federal Tort Claims Act**
**The United States of America**

1-59. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 59 as if as if fully stated herein.

60. Federal agents of the United States intentionally and unlawfully restrained Ms. Martinez's personal liberty against her will by arresting her without probable cause or justification to do so, beginning on October 4th, 2025 and continuing up to October 6, 2025 when a federal judge ordered Ms. Martinez's release.

61. This arrest was caused by and came at the request and/or direction of Agents Exum, Cordero, and/or Perkins. These agents caused Ms. Martinez's arrest despite not having any

evidence or information that would lead a person of ordinary caution to believe or to entertain an honest and strong suspicion, that Ms. Martinez committed any offense that would justify her arrest.

62. Ms. Martinez's arrest was caused by and founded upon false evidence provided to the FBI by Agents Exum, Cordero, and/or Perkins. These agents produced false evidence to indicate that Ms. Martinez attempted to harm them with her vehicle despite knowing that Ms. Martinez was innocent of any such acts and never presented a risk of harm to any agents or the public.

63. Ms. Martinez's arrest was caused by and founded upon the alteration and/or suppression of exculpatory evidence by Agents Exum, Cordero, and/or Perkins through *inter alia*, failing to preserve the SUV so it could be analyzed, failing to operate their BWC during the initiation of lethal force against Ms. Martinez as required by CBP policy, and failing to document that Ms. Martinez never presented a risk of harm to the agents or to the public.

64. At all times, these federal agents were officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law and they acted within the course and scope of their agency with the United States of America.

65. As a direct and proximate result of this unlawful detainment, Ms. Martinez has suffered severe injuries of a pecuniary and personal nature and she suffered severe anxiety, terror, and physical discomfort.

66. At no time did the federal agents have discretion to effectuate Ms. Martinez's wrongful arrest and they did so in contravention to federal law and policy which prohibit the fabrication and provision of false evidence.

67. All private persons would be liable to Ms. Martinez under like circumstances for false arrest under the laws of Illinois. Because the federal agents causing Ms. Martinez's false arrest were investigative or law enforcement officers acting within the scope of their federal

employment, the United States is liable for their false arrest under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674, and 2680(h).

**Count VII**
**False Imprisonment - Federal Tort Claims Act**
**The United States of America**

1-59. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 59 as if as if fully stated herein.

60. Federal agents of the United States intentionally and unlawfully restrained Ms. Martinez's personal liberty against her will by detaining her without probable cause thereby preventing her from exercising freedom of movement, beginning on October 4, 2025 at Mt. Siani Hospital and continuing up to October 6, 2025 when a federal judge ordered Ms. Martinez's release from her unjust and unlawful detainment.

61. This restraint was caused by and came at the request and/or direction of Agents Exum, Cordero, and/or Perkins. These agents caused Ms. Martinez's imprisonment despite not having any evidence or information that would lead a person of ordinary caution to believe or to entertain an honest and strong suspicion, that Ms. Martinez committed any offense that would justify her imprisonment.

62. Ms. Martinez's imprisonment was caused by and founded upon false evidence provided to the FBI by Agents Exum, Cordero, and/or Perkins. These agents produced false evidence to indicate that Ms. Martinez attempted to harm them with her vehicle despite knowing that Ms. Martinez was innocent of any such acts and never presented a risk of harm to any agents or the public.

63. Ms. Martinez's imprisonment was caused by and founded upon the alteration and/or suppression of exculpatory evidence by Agents Exum, Cordero, and/or Perkins through *inter alia*, failing to preserve the SUV so it could be analyzed, failing to operate their BWC during the

initiation of lethal force against Ms. Martinez as required by CBP policy, and failing to document that Ms. Martinez never presented a risk of harm to the agents or to the public.

64. At all times, these federal agents were officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law and they acted within the course and scope of their agency with the United States of America.

65. As a direct and proximate result of this unlawful imprisonment, Ms. Martinez has suffered severe injuries of a pecuniary and personal nature. Ms. Martinez suffered severe anxiety, terror, and physical discomfort from her wrongful imprisonment and particularly while being wrongfully detained at the Metropolitan Correctional Center.

66. At no time did the federal agents have discretion to effectuate Ms. Martinez's wrongful imprisonment and they did so in contravention to federal law and policy which prohibit the fabrication and provision of false evidence.

67. All private persons would be liable to Ms. Martinez under like circumstances for false imprisonment under the laws of Illinois. Because the federal agents effectuating Ms. Martinez's false imprisonment were investigative or law enforcement officers acting within the scope of their federal employment, the United States is liable for their false imprisonment under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674, and 2680(h).

## Relief Requested

WHEREFORE Plaintiff, Marimar Martinez, prays for judgment against Defendant as follows:

A. Compensatory damages against Defendant for physical and emotional injuries and pain, in an amount determined by the finder of fact to be fair, just and reasonable and in conformity with the evidence at trial;

B. The costs, interest, and disbursements of this action; and

C. All further legal and equitable relief as the Court deems just and proper

Respectfully submitted,

*/s/ Michael Gallagher*

Michael Gallagher
Thomas Stewart
Gallagher & Kosner
161 North Clark Street, Suite 3050
Chicago, Illinois 60601
312-910-5050
mg@gallagherinjurylaw.com
ts@gallagherinjurylaw.com

and

*/s/ Christopher V. Parente*
*/s/ Damon M. Cheronis*
Christopher V. Parente
Damon M. Cheronis
Cheronis & Parente
140 S. Dearborn, Suite 404
Chicago, IL 60603
773-458-4899
cparente@cheronislaw.com
damon@cheronislaw.com

*Attorneys for Plaintiff*